## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| JEANETTE W. HOOTS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   7:03-cv-03446-JEO |
| | ) |
| METROPOLITAN LIFE INSURANCE | ) |
| COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter is before the court on the defendant's motion for summary judgment.  (Doc.

18).[1]  Because there are no material facts in dispute, and because the defendant correctly denied

the plaintiff's application for continued benefits under the relevant short term disability plan, the

court finds that the defendant's motion for summary judgment is due to be granted.

The plaintiff, Jeanette Hoots (hereinafter "the plaintiff"), alleges that the defendant,

Metropolitan Life Insurance Company, Inc. (hereinafter "MetLife" or "the defendant"), wrongly

denied her benefits under the Short Term Disability Plan (hereinafter "STD Plan") that it was

administering on behalf of her employer, Cingular Wireless, L.L.C. (hereinafter "Cingular").

(Doc. 1).  The defendant disagrees, arguing that she failed to provide "objective medical

evidence" of her disability.

### BACKGROUND FACTS

The following facts are either uncontroverted or expressly agreed upon by both parties.

The plaintiff began working for BellSouth Mobility (now Cingular) in early 1996 as an outside

---

[1]References herein to "Doc.__" are to document numbers assigned the pleadings by the Clerk of the Court.

sales representative.  She was eventually enrolled in Cingular's STD Plan, Long-Term Disability

Plan, and Supplementary Long-Term Disability Plan.

 On July 31, 2001, the plaintiff apparently suffered an anxiety attack related to a number

of conditions, but primarily ascribed to mitral valve prolapse.  She applied for and was granted

short term disability benefits by Kemper Insurance Company (hereinafter "Kemper"), then the

administrator of the Cingular STD Plan, on September 7, 2001.  In December 2001, at the behest

of Kemper, the plaintiff was examined by two independent medical examiners, Drs. Armando

Garcia and S. Kansal (both cardiologists), who concluded that "there is no objective medical

evidence that this patient . . . is unable to do her job everyday."  (Def. 00106 & 00108).[2]  They

suggested that she could perform a desk job at least part time.  (Def. 00111).  By early January

2002, MetLife assumed the role of program administrator for Cingular's STD Plan, and informed

the plaintiff that her STD benefits were set to expire on January 7, 2002.[3]  At that point or soon

thereafter, MetLife told the plaintiff that it would accept and review any medical information she

submitted in support of further STD benefits.

Over the course of the administrative review process, the plaintiff submitted various

letters for the defendant's consideration.  The first was a letter, dated February 8, 2002, from Dr.

---

[2]References herein to "Def. ___" refers to the numbered pages of the defendant's exhibits appended to its motion for summary judgment.

[3]This date was presumably selected because the STD Plan allows only for 6 months of STD benefits for any one injury/condition or cumulatively for injuries/conditions that are not separated by at least 14 days of incident-free work (see Def. 00013).  It is not clear whether the plaintiff returned to her usual employment for any period of time before applying for the disputed STD benefits.  However, because neither party addressed it (and because the plaintiff's failure to return would have clearly bared her receipt of any further STD under the terms of the Plan), the court will assume that the medical condition at dispute in this case would not have been combined with the condition that lead to the 6 months of benefits already credited to the plaintiff.

Susan Phillips, a cardiologist.[4]  Dr. Phillips states, "I am treating [the plaintiff] for Mitral Valve

Prolapse and Dysautonomia.  She additionally has Chronic Fatigue Syndrome, Fibromyalgia and

Depression.  She has not been able to work due to these diagnoses in particular, Fibromyalgia."[5]

(Def. 00094).  The second letter also was from Dr. Phillips and was dated February 19, 2002.  It

states:

> I have referred [the plaintiff] to a rheumatologist, Dr. Maura Kennedy, March 22,
> 2002 for evaluation and treatment of fibromyalgia.
>
> I personally am unable to give specific work limitations for [the plaintiff] as most
> of her debilitating symptoms relate to fibromyalgia, not Mitral Valve Prolapse.  I
> am in hopes that as soon as she sees Dr. Kennedy, she can do this for you.

(Def. 00096).  Next, the plaintiff submitted a clinic note, dated March 7, 2002, from Dr. Bryan S.

Givhan, a neurosurgeon.  It provides:

> . . . we have ruled out any significant intracranial pathology.  I have explained to
> the patient that I think the majority of her symptoms are still secondary to the
> fibromyalgia.  Unfortunately, surgical intervention is not going to be helpful.  We
> are going to discharge her from clinic and refer her to Dr. Jones and Ayers for
> possible treatment of her fibromyalgia.  We will see her back in the office if any
> new surgical problem develops.

(Def. 00091).  Lastly, she submitted a "History and Physical Evaluation" (hereinafter "HPE")

---

[4]The court notes that its review of the file indicates that the only reference to Dr. Phillips being a cardiologist is in the plaintiff's brief (doc. 21) at page 2, ¶ 6.  Regardless, the result in this matter would be the same.

[5]Fibromyalgia is defined at WebMD as follows:

Fibromyalgia is a non-life-threatening, chronic disorder of the muscles and related soft tissue, including ligaments and tendons.  Its main characteristics are muscle pain, fatigue, sleep disturbances, and tender points at certain parts of the body.  Many people describe fibromyalgia as feeling like a persistent flu.

"Understanding Fibromyalgia -- The Basics," http://www.webmd.com/content/article9/1680_54837.htm (last visited February 14, 2006).

form dated April 10, 2002, from Dr. James T. Barnett, Jr., a Physiatrist,[6] stating that the plaintiff

> . . . has been to a Rheumatologist in Birmingham, Dr. Kennedy. Dr. Kennedy notes that [the plaintiff] has severe myofacial pain syndrome or Fibro Myalgia [sic] particularly by physical exam.
>
> . . .
>
> IMPRESSION:      1) Dysautonomia with Mitral valve prolapse.
>
>                                  2) Myofacial pain syndrome or Fibro Myalgia [sic].
>
>                                  3) Frequent headaches.
>
>                                  4) Status post left and right carpal tunnel syndrome. . . .
>
>                                  5) Recent history of bilateral breast reduction.
>
>                                  6) Insomnia.
>
> Further evaluation, I would like to have on hand of [sic] her medical records including [the records of the doctor that treated the plaintiff for her condition(s) in July of 2001 when she first applied for STD benefits].
>
> Disability determination: [The plaintiff] appears to be quite reliable and trustworthy as a historian. Her situation is quite believable. She is very frustrated with the general lack of solid diagnosis. . . . Again her history and physical examinations are quite believable and compatible with the aforementioned diagnosis. Given the degree of problems she's had over the last three years I would not expect her to significantly improve within the next 18 months to two years. I also believe that she is indeed disabled from holding down her previous job or other gainful employment.

(Def. 00085-87).

On May 13, 2002, the defendant denied the plaintiff's STD claim, citing a lack of

"objective medical evidence to substantiate [the plaintiff's] disability." (Def. 00089).

---

[6]A physiatrist is a physician that specializes in physical medicine. Mirriam-Webster's Collegiate Dictionary – 10th ed. (2002).

Additionally, it stated that "the evaluation of the physical examination did not support functional limitation or objective findings that would prevent [the plaintiff] from performing [her] job duties." (*Id*.).

The plaintiff submitted two handwritten letters of appeal, dated July 8, 2002, and December 6, 2002, to MetLife. (Def. 00081-82, 00073-74). No records from Drs. Kennedy, Jones, or Ayers have been submitted by the parties. In her brief, the plaintiff makes no direct reference to visiting any of these doctors, and neither party claims that documentation from any of these three doctors was ever sent to or received by the defendant.

In December 2002, MetLife had the plaintiff's claim package (including the documents listed above) reviewed by an internal medicine physician, Dr. Mark Moyer, and a psychiatrist, Dr. Kenneth Bush. (Def. 00065-72). Both doctors concluded that there was not enough objective evidence in the plaintiff's package to render her either totally or partially disabled. (*Id*.). Shortly thereafter, MetLife issued a final denial of the plaintiff's appeal. (Def. 00131-133). This lawsuit followed. The parties agree that the Plan applicable in this action is governed by the Employee Retirement Income Security Act (29 U.S.C. § 1001, *et seq*.) (hereinafter "ERISA").

### Plan Definitions and Requirements

The Cingular STD Plan places the onus squarely on the employee to prove her disability, stating that "'in order to establish your Disability you must present credible, objective medical evidence' as determined by the claims administrator." (Plaintiff's Brief at p. 2;[7] see also Def. 00015 and 20). The Plan further informs the employee as follows, "[i]t is your responsibility to

---

[7]The plaintiff's brief is located at document 21. The plaintiff's evidentiary submission is located at document 22.

provide the documentation supporting your claim.  If you fail to submit the documentation

requested by the Claims Administrator . . . your claim will be denied and your STD . . . benefits

will stop."  (Def. 00020).  MetLife determines eligibility for STD benefits premised upon the

body of evidence submitted by the claimant, viewed in light of the following definitions of total

disability and partial disability:

> *Total Disability* for STD benefits means that due to an illness or injury you are
> unable to perform your customary job, or another available job assigned by your
> company with the same full-time or part-time classification for which you are
> reasonably qualified.
> *Partial Disability* means that you are unable to perform your customary job, or
> another available job assigned by your company with the same full-time or
> part-time classification for which you are reasonably qualified, for the same
> number of hours that you were regularly scheduled to work before your Disability.

(Def. 00005).

## STANDARD OF REVIEW

The Eleventh Circuit Court of Appeals has addressed the issue of the appropriate standard

of review in ERISA cases involving situations such as the present one where Cingular is the Plan

administrator and MetLife is the claims administrator.  The court has held that the "heightened

standard of review" for ERISA cases is applicable.  It further summarized the review procedure

as follows:

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with
> the administrator's decision);[ ] if it is not, then end the inquiry and affirm the
> decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," [ ] then
> determine whether he was vested with discretion in reviewing claims; if not, end

judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds [ ] supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply the heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecommunications, Inc.*, 337 F.3d 1132, 1138 (11th Cir. 2004).  Because the court finds that the Plan Administrator's decision is not "de novo wrong," the court need not go any further and must affirm the decision.

## DISCUSSION

As just indicated, the initial question before the court is whether MetLife's decision to deny the plaintiff STD benefits was wrong.  *Williams*, 337 F.3d at 1138.  The defendant argues that the claim was properly denied premised upon the record.  Specifically, it asserts that the documents submitted by the plaintiff failed to provide "objective medical evidence" of the plaintiff's fibromyalgia and its effect on her ability to work.  (Def. Brief at p. 18).[8]  The plaintiff simply disagrees – she claims that her three physicians and the four medical documents referenced above in fact do yield the objective evidence required by the Plan.  (Plaintiff's Brief at

---

[8]The defendant's brief is located at document 19 in the court's record.

p. 11).[9]  The parties do not dispute that the information from these doctors, in the form of the foregoing documents, was properly before the claim administrator, nor do they assert that MetLife should have considered any additional evidence at the time of the decision.  They dispute the propriety of the ultimate determination by MetLife.

The plaintiff's right to STD benefits must be "established by contract under the terms of the ERISA-governed benefit plan document."  *Alday v. Container Corporation of America*, 906 F.2d 660, 665 (11th Cir. 1990).  The relevant issue is whether the doctors' statements contained in the materials before the Plan administrator when considered individually or collectively provide "objective medical evidence" of a debilitating that rendered the plaintiff "unable to perform [her] customary job?"

Reviewing the records in chronological order, the court will begin with Dr. Phillips' letter dated February 8, 2002.  Therein, she states that she was "treating Ms. Hoots for Mitral Valve Prolapse and Dysautonomia.  She additionally has Chronic Fatigue Syndrome, Fibromyalgia, and Depression.  She has not been able to work due to these diagnosis [sic] in particular, Fibromyalgia."  (Pl. Ex. 1).[10]  The conlcusory statements in this letter providing that the plaintiff was "disabled" due to Fibromyalgia, must be read in conjunction with Dr. Phillips' subsequent letter of February 19, 2002.[11]

In her second letter, Dr. Phillips explains that she referred the plaintiff to Dr. Maura Kennedy, a rheumatologist, "for evaluation and treatment of fibromyalgia."  (Pl. Ex. 2).  She

---

[9]The plaintiff's brief is located at document 21.

[10]"Pl. Ex. ___" refer to the exhibits included with the plaintiff's brief.

[11]The letter is actually dated February 19, 2001, however, that date appears to be a typographical error because the facsimile information at the top indicates a date of February 19, 2002.  (Pl. Ex. 2).

further states "I am personally unable to give specific work limitations for [the plaintiff] as most of her debilitating symptoms relate to fibromyalgia, not Mitral Valve Prolapse.  I am in hopes that as soon as she sees Dr. Kennedy, she can do this for you."  (*Id*.).  Dr. Phillips clearly states that the plaintiff's symptoms are "debilitating," however, she specifically defers to the specialist, Dr. Kennedy, with regard to the evaluation and treatment of the plaintiff's condition.

Neither of these letters contains an articulation of "objective medical evidence" regarding the plaintiff's fibromyalgia sufficient to support a disability determination.[12]  Additionally, because Dr. Phillips specifically declined to recommend work limitations that could be used by the claims administrator to determine if the plaintiff qualified as totally or partially disabled, her letters provide little help in making the appropriate disability determination.

In a clinic note dated February 26, 2002, Dr. Bryan Givhan, a neurosurgeon, wrote as follows:

> Ms. Hoots returns to clinic today after having been re-referred by Dr. Spruill for some strange symptomatology which seems to be somewhat consistent with vertebral basilar insufficiency.  This patient has been treated for a long period of time with fibromyalgia and multiple other complaints of cardiac dysrhythmias and mitral valve prolapse, and migraine headaches.  The patient states that now when she turns her head in certain positions, she will have extreme numbness in her face and almost feel like she is going to pass out.  These symptoms are sometimes associated with confusion and memory loss. . . .
>
> On her exam today, the patient is completely neurologically intact.  I have

---

[12]Neither party specifically states what the "objective medical evidence" of fibromyalgia would be.  The court notes that the "WebMD.com" cite states that "[t]he formal criteria used to diagnose fibromyalgia include:

Widespread pain that has been present for at least 3 months.
Pain and tenderness at 11 or more of 18 specific tender points, which usually occurs only when the areas are pressed.  (Some people may have fewer than 11 tender points but still have fibromyalgia.)
The presence of other symptoms typical of fibromyalgia, such as stiffness, fatigue, or sleep difficulties.
These may get worse with increased stress, anxiety, exertion, or changes in the weather."

"A-Z Health Guide from WebMD: Health Topics.  Fibromyalgia: Exams and Tests (citing Goldenberg DL (April 26, 1999) Fibromyalgia Syndrome a Decade Later.  Archives of Internal Medicine, 159:777-785)."

9

> reviewed her CT of her cervical spine.  She has got some mild uncovertebral
> spurruing at C4-5 but no significant cord compression or any other abnormalities
> there.  I am not clear as to what is going on in this particular case.  I guess she
> could have some vertebral basilar insufficiency but we are going to evaluate this
> further with MR angiogram of the head and regular MRI of the head in that her
> brain has not been looked at throughout her clinical treatment course.  We will see
> the patient back upon completion of these studies and make further disposition in
> her case at that time.

(Def. at 00092).  In a second letter dated March 7, 2002, Dr. Givhan states, "I have explained to

the patient that I think the majority of her symptoms are still secondary to the fibromyalgia . . . .

We are going to discharge her from clinic and refer her to Dr. Jones and Ayers for possible

treatment of her fibromyalgia."  (Pl. Ex. 4).  He, much like Dr. Phillips, does not give any

opinion on the plaintiff's ability (or lack thereof) to return to work, instead deferring to other

doctors who would presumably be able to formulate a complete diagnosis and recommendation.

Again, because of the lack of any articulation of "objective medical evidence" supporting the

fibromyalgia diagnosis, these records are simply insufficient to support the plaintiff's claim as

required by the Plan.

Lastly, the plaintiff offers the documentation from her H&PE which was performed on

April 1, 2002, by Dr. James Barnett, a Physiatrist.  (Pl. Ex. 3 at p. 2).  Dr. Barnett notes that the

plaintiff "has been to a Rheumatologist in Birmingham, Dr. Kennedy.  Dr. Kennedy notes that

[the plaintiff] has severe myofacial pain syndrome or Fibro Myalgia [sic] particularly by physical

exam."  (*Id*.).  He indicates that the records he was reviewing were incomplete.  Specifically, he

writes, "Further evaluation, I would like to have on hand of [sic] her medical records including

[records of the doctor that treated the defendant for her condition(s) in July of 2001 when she

first applied for STD benefits]."  (*Id*. at p. 3).  Under the heading "Disability Determination," Dr.

Barnett opines that he "believe[s] that [the plaintiff] is indeed disabled from holding down her previous job or other gainful employment."  (*Id*.).  He further states that "[the plaintiff] appears to be quite reliable and trustworthy as a historian.  Her situation is quite believable . . . her history and physical examination are quite believable and compatible with the afore mentioned [sic] diagnosis . . . ."  (*Id*.).  However, he does note that the plaintiff is frustrated at the "lack of solid diagnosis."  (*Id*.).  Given the nature of Dr. Barnett's evaluation, which relies particularly on the representations of the plaintiff, the conclusory determinations of other doctors, and the fact it offers no supporting medical data, records, or testing, the court cannot conclude that the determination of the plan administrator is wrong.  To the contrary, premised on the evidence before the court, it finds that the determination was correct.

Viewing the record in a light most favorable to the plaintiff, one thing is clear – the fibromyalgia diagnosis most likely would have come from the specialist that the plaintiff was referred to by her other physicians.  Whether this specialist is Dr. Kennedy (referenced by Drs. Phillips and Barnett)[13] or Dr. Jones or Dr. Ayers (referenced by Dr. Givhan),[14] it is also clear from the record that MetLife never received documentation from any of these doctors concerning their examinations, evaluations, determinations, or other findings and conclusions.  What is not clear is exactly when the plaintiff visited any of these specialists and what "objective medical evidence" they possessed to support a determination that the plaintiff suffered from fibromyalgia

---

[13]Dr. Phillips noted in her February 19, 2002 letter, that she was "referr[ing the plaintiff] to a rheumatologist, Dr. Maura Kennedy, March 22, 2002 for evaluation and treatment of fibromyalgia."  (Pl. Ex. 2).  Dr. Barnett notes in the H&PE that the plaintiff has been to Dr. Kennedy who "notes that she has severe myofacial pain syndrome or Fiber Myalgia. [SIC] . . ."  (Pl. Ex. 3 at p. 2).

[14]In his discharge note, Dr. Givhan stated that he was "going to discharge [the plaintiff] from clinic and refer her to Dr. Jones and Ayers for possible treatment of her fibromyalgia."  (Pl. Ex. 4).

11

or any other debilitating sickness the relevant time.  The difficulty in the present situation is that, for what ever reason, the plaintiff never produced medical records of the doctors detailing "objective medical evidence" to support a disability finding.

In sum, the plaintiff failed in her responsibility to submit the requisite information to MetLife.  In the chronological "diary review-report" maintained by the defendant, a MetLife employee notes on April 9, 2002, that she "advised [the plaintiff by telephone] that we have not received a copy [of her rheumatology or physiatry evaluations] and she will need to secure copies of both exams and provide [them] to MetLife."  (Def. 00124-25).  On August 28, 2002, MetLife sent a letter to the plaintiff acknowledging her appeal and reminding her to "submit[ ] additional information in support of [her] appeal."[15]  (Def. 00076).  Even assuming that the plaintiff never received the telephone call or reminder letter, the plain text of the Plan (see Def. 00015, 20, & 36) compels the plaintiff to forward records from her specialists in support of her claim.

There is no dispute that the plaintiff suffers from various medical maladies.  At least three doctors expressed concern over her situation and suggested further action to secure treatment for her.  However, those doctors never articulated the requisite objective support for the diagnosis or a modified work schedule that would qualify her for short term disability benefits related to fibromyalgia or any other sickness.  The role of MetLife, as the plan administrator, was not to ferret out evidence in support of or against the plaintiff's claim, but merely to evaluate whether

---

[15]In pertinent part, the letter stated:

We have received your appeal letter requesting a review of your disability claim.  You have indicated that you will be submitting additional information in support of your appeal.  If you have any additional information you wish to have considered, you must submit it within 180 days from your receipt of the notice of your claim of denial or termination.  Once your complete appeal has been submitted, your claim will be referred for an independent claim review.

(Def. 00076).

the evidence that was before it justified STD benefits under Cingular's Plan.  Similarly, the court

is not required to ascertain whether the plaintiff indeed had fibromyalgia, but to decide whether

MetLife was *de novo* wrong in its analysis of the evidence that the plaintiff chose to submit.

In view of the evidence in the record, the court simply cannot say that MetLife's decision

to deny the plaintiff STD benefits was "*de novo* wrong."  Because the court finds no grounds

exist to disturb MetLife's STD plan determination under the *de novo* standard, the court's inquiry

must end under the *Williams* analysis.

To the extent that the plaintiff challenges the defendant's assessment premised on the fact

that it relied upon the evaluation and opinion of Dr. Kansal because "he, as a cardiologist, can be

presumed to know little or nothing about fibromyalgia, which is not a heart condition but a

musculo-skeletal one," the court is not impressed.[16]  (Plaintiff's Brief at p. 10).  However, it is

interesting to note that according to the plaintiff's brief, Dr. Phillips is also a cardiologist.  (*Id.* at

p. 2, ¶ 6).  Thus, it is inconsistent to criticize MetLife for consulting with Dr. Kansal while

arguing that the court should accept the conclusions of Dr. Phillips.  Regardless, the necessary

evidence to support a finding of disability is not present.

To the extent the plaintiff also challenges the initial opinion of Dr. Garcia in December

2001 because, according to the plaintiff, the opinion is "merely confirmatory of Dr.

Kansal's dubious evaluation, [and] it should be drastically [discounted], if not disregarded

altogether," the court disagrees.  (Plaintiff's Brief at p. 11).  This "confirmatory" information,

which was before the defendant and is before this court, cannot be ignored simply on the

---

[16]In his report, Dr. Kansal does find no objective evidence of any significant disease, but notes the importance of a
rheumatologist opinion with blood work to document any immunological abnormality.  (Def. at 00108).  This is consistent with
the court's finding that the plaintiff failed to provide any "objective medical evidence" of her disability.

argument of the plaintiff.  It must be evaluated along with the other relevant evidence under the requisite summary judgment standard.

## CONCLUSION

Premised on the foregoing, the court finds that the defendant's motion for summary judgment is due to be granted.  An appropriate order will be entered.

**DONE**, this 17th day of February, 2006.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge